**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **BARRETT GREEN** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil No.: **PJM 13-1961** |
| | * | |
| **PRO FOOTBALL, INC. d/b/a** | * | |
| **THE WASHINGTON REDSKINS, et al.** | * | |
| | * | |
| Defendants | * | |

**OPINION**

**I.**

Introduction

Between the years 2000 and 2004, Barrett Green ("Green") was a professional football player with, among others, the New York Giants team of the National Football League ("NFL"). Pro Football, Inc. ("Pro Football") at all relevant times was the owner of the Washington Redskins team.[1] Green claims that Pro Football, through at least one of its coaches, established and/or tolerated a bounty program wherein its team's players were given financial rewards for deliberately injuring opposing players. Green sued Pro Football and Robert Royal, a former player on the Washington team, in the Circuit Court for Prince George's County, Maryland, alleging state law torts Green says he suffered as a result of this bounty program during a game between the New York and Washington teams.

Pro Football removed the case to this Court on the basis of purported federal question jurisdiction, and subsequently filed the present Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Paper No. 11). Royal has also filed a Motion to Dismiss, or in the

---

[1] Pro Football's team is popularly known as the Washington "Redskins," but the Court will refrain from using the team name unless reference is made to a direct quote where the name appears. Pro Football's team will be referred to hereafter simply as "the Washington Team."

Alternative, Motion for Summary Judgment (Paper No. 16), joining Pro Football's arguments.

Green moved to remand the case to state court, but thereafter withdrew his Motion, asserting

jurisdiction in this Court on the basis of diversity of citizenship.[2] Supplemental briefing having

concluded, the Court now rules on Pro Football's and Royal's Motions. For the reasons that

follow, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** their Motions to Dismiss, or in

the Alternative for Summary Judgment.

## II.

### Factual Background

According to the Complaint, on December 5, 2004, Green, who was a defensive

linebacker for the New York Giants, was playing in a game with the Washington team at the

Washington team's Maryland stadium. Compl. ¶ 13. Royal was playing for the Washington team

as an offensive tight end. *Id.* ¶ 15.

According to the Complaint, the Washington team deemed Green a "disruptive presence"

in his team's prior win against the Washington team on September 19, 2014, after Green stopped

Washington's running game and recovered a fumble, returning it for a touchdown. *Id.* ¶ 12. The

Giant's next game against the Washington team was the December 5, 2004 encounter. *Id.* ¶ 13.

Green was listed on the injury report for the week as "questionable" by reason of a knee injury

he sustained several weeks before. *Id.* ¶ 14. Nevertheless, Green was able to and did play on

December 5. In the third quarter of the game, Royal lined up as a receiver for Washington. *Id.* ¶

15. After the ball was snapped to the Washington quarterback, Royal allegedly ran towards

Green, who was defending for the Giants, lowered his helmet and at full speed dove into Green's

knees. *Id.* ¶ 20. The referee ruled Royal's action an illegal "crackback" block under the rules of

---

[2] Green's Motion to Remand was based on lack of federal question jurisdiction. He withdrew his Motion after a status conference with the Court, asserting jurisdiction instead on the grounds that the parties are diverse and that the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

the game and penalized the Giants.[3] *Id.* ¶ 22. As a result of the hit, Green was immediately

disabled and had to be assisted off the field. He was later determined to have torn his anterior

cruciate ligament ("ACL"). *Id.* ¶¶ 24-25. Although Green underwent surgery when the season

ended, he never recovered his form and his football career was effectively over. *Id.* ¶ 26.

 At the time of the hit, Green was suspicious that he might have been purposely targeted

and told his head coach of his suspicion. *Id.* ¶ 35. He also told the *New York Post* that he thought

Royal's hit was intentional. *Id.* ¶ 36. Green's head coach, however, told him it was not possible

that the injury was intentional. *Id.* ¶ 37. Green says he relied on this statement, believing that an

investigation had been, or would be made. *Id.* ¶ 38. He also relied on Royal's own

representations, after Green's press statement, that the injury was unintentional. *Id.* ¶ 39.

 At that time and for some time thereafter, however, Green says he was not aware that as

of the time of the hit by Royal, the Washington team had a bounty program in place whereby,

according to Green, its players would receive financial rewards for deliberately injuring

opposing players. It was not until March 3, 2012, when the *Washington Post* published an article

entitled "NFL to investigate Redskins over bounty allegations under [Coach] Gregg Williams,"

which reported that the team's defense under Williams may have had a system to reward players

with cash for hits that knocked opponents from games, that Green became aware of the program.

*Id.* ¶¶ 40-41. Also, at about the same time, the NFL announced its findings, after investigation,

that when serving as Defensive Coordinator for the New Orleans Saints team, Williams was

---

[3] The rule against illegal "crackback" blocks in the 2004 NFL Rules of Play states: "At the snap [of the ball], an offensive player who is aligned in a position more than two yards laterally outside an offensive tackle, or a player who is in a backfield position at the snap and then moves to a position more than two yards laterally outside a tackle, may not clip an opponent anywhere, nor may he contact an opponent below the waist if the blocker is moving toward the position where the ball was snapped from, and the contact occurs within an area five yards on either side of the line of scrimmage." 2004 Official Playing Rules of the National Football League, Rule 12, Section 2, Article 10.

determined to have implemented a bounty program of the same type allegedly in effect with the Washington team. *Id.* ¶ 42.

### III.

### Green's Claims and Defendants' Motions

Once Green learned of the bounty program, he brought his suit in the Circuit Court for Prince George's County against Pro Football, Royal, and Williams (who has since been dismissed from the suit), alleging that Royal's career-ending hit on him in 2004 was made pursuant to the Washington team's bounty program. His suit proceeds on the following counts: Count I for Battery against Royal; Count II for Vicarious Liability against Pro Football; Count III for Negligence against Royal; Count IV for Negligence against Pro Football, and Count VI for Negligent Supervision against Pro Football.[4]

In their Motions to Dismiss, or in the Alternative, for Summary Judgment, Pro Football and Royal argue that Green's claims are barred by the statute of limitations and, in any case, are completely preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). In this regard, they argue that Green's claims are covered by a Collective Bargaining Agreement ("CBA") in effect between the National Football League, its owners, and players, and that Green failed to exhaust his remedies as provided in the CBA.

The Court considers these arguments.

### IV.

### Legal Standard

### A.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

---

[4] Count V for Negligence against Gregg Williams is no longer in the case.

U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). "It requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

In considering such a motion, the court ordinarily accepts the complaint's factual allegations and draws any reasonable factual inferences in favor of the plaintiff. *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278, 284 (4th Cir. 2012).

If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d); *Laughlin v. Metropolitan Washington Airports*, 149 F.3d 253, 260-61 (4th Cir. 1998).

## B.

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the facts and all inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A mere existence of a scintilla of evidence" is not sufficient to create a genuine issue of material fact. *Anderson*, 477 U.S. at 251-52. There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## V.

<u>Contentions of the Parties</u>

Pro Football and Royal argue first that all of Green's claims are barred by the Statute of Limitations. The Complaint, they say, was brought after Maryland's three year statute expired, *see Ford v. Douglas*, 799 A.2d 448, 449 (Md. Ct. Spec. App. 2002) (three years for battery); Md. Code. Ann., Cts & Jud. Proc. § 5-101 (three years for negligence), and submit that no exception tolled the three year period. Because, they say, Green concedes he was immediately aware of his potential battery claim at the time of Royal's hit, he was charged with promptly investigating all his potential claims. In opposition, Green argues that his claims are indissolubly linked with the bounty program, the existence of which he could not reasonably have discovered until the program was revealed in the press and by the NFL in 2012. He further argues that his claims were tolled by the fraudulent concealment doctrine.

Pro Football and Royal next argue that Green's claims, all of which are predicated on state law, are completely preempted by § 301 of the LMRA, 29 U.S.C. § 185(a), by reason of the CBA in effect in the National Football League, and say further that because Green failed to exhaust his remedies under the CBA, his suit must be dismissed as a matter of law. Green disputes that his claims are in any way controlled by the CBA or that his claims are in any way preempted by the LMRA; they arise, he says, solely out of state law.

In Supplemental Briefing in response to the questions raised by the Court at a motions hearing, Green argues that an appropriate theory of direct liability against Pro Football (and Royal, for that matter) would be a civil conspiracy claim, which he says he has sufficiently

alleged in his Complaint. In the alternative, he asks for leave to amend to include a separate civil conspiracy claim. He submits that a civil conspiracy claim would not be barred by the statute of limitations for the same reasons his other claims are not barred; that is, he could not reasonably have discovered his claims until the existence of the bounty program was revealed in 2012. Pro Football and Royal argue that a civil conspiracy claim would be barred for the same reasons as the original claims.

## VI.

### Discussion

There is no question that Green's Complaint is something of a jumble. He mixes claims of negligence, gross negligence, and malice in a single count. But, as it stands,[5] this much does emerge from the Complaint: Whatever injury Green sustained, he alleges came about because the Washington Team had a policy in place to pay its players to deliberately inflict physical injuries on opposing players, the so-called "bounty" program, and submits that Royal deliberately injured him pursuant to that program. This set of facts would ordinarily give rise to a claim of battery, an intentional tort. And, of course, if a battery is committed in the scope of his employment by an employee (e.g., Royal) against a third person (e.g., Green), then the employer (e.g., Pro Football through the Washington team), may be held responsible according to the well-established doctrine of respondeat superior.

At the same time, Green has pleaded, presumably as an alternative theory, that both Pro Football and possibly Royal committed ordinary negligence or gross negligence or acted with malice when Royal, individually and qua employee, engaged in an alleged hit against him. These torts of course are not intentional torts; they bespeak neglect or gross neglect of a duty which

---

[5] For the sake of simplicity, the Court will grant Green leave to amend his Complaint to add a count of Civil Conspiracy against Pro Football and Royal. However, in view of rulings the Court is making with regard to certain other of Green's Counts, the Amended Complaint will need to also take those rulings into account.

may even be motivated by ill will or hatred. The distinction between these torts and the intentional tort of battery is important in this case because, as the Court will now proceed to explain, while the intentional tort of battery – the tort claim tied to the bounty program – may be subject to one disposition as far as the statute of limitations is concerned, the negligence torts are subject to a different disposition.

## VII.

### Statute of Limitations

Does the statute of limitations bar Green's claims as a matter of law?

Limitations as a bar to a plaintiff's cause of action constitutes an affirmative defense that may be raised by motion pursuant to Fed. R. Civ. P. 12(b)(6) if the time bar is apparent on the face of the complaint. *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005).

"[A] motion to dismiss ordinarily should not be granted by a trial court based on the assertion that the cause of action is barred by the statute of limitations unless it is clear from the facts and allegations on the face of the complaint that the statute of limitations has run." *Litz v. Maryland Dep't of Env't*, 76 A.3d 1076, 1086 (Md. 2013); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (stating that the "principle" that the affirmative defense that a claim is barred by the Maryland statute of limitations "may be reached by a motion to dismiss filed under [the Federal Rules of Civil Procedure] . . . only applies, however, if all facts necessary to the affirmative defense clearly appear *on the face of the complaint*") (emphasis in original) (quotation and citation omitted)).

The question of when a cause of action accrues is ordinarily "left to judicial determination." *Frederick Road Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 973 (Md. 2000). The determination of when an action accrued "may be based solely on law, solely on fact, or on a

combination of law and fact." *Hecht v. Resolution Trust Corp.*, 635 A.2d 394, 399 (Md. 1994).

When it is necessary to make a factual determination to identify the date of accrual, however,

those factual determinations are generally made by the trier of fact, and are not decided by the

court as a matter of law. *Litz*, 76 A.3d at 1086 (2013), *citing O'Hara v. Kovens*, 503 A.2d 1313,

1323-24 (Md. 1986).

### A.   Maryland law

In Maryland, the statute of limitations for each claim at issue is three years. That is, a

claim for battery or vicarious liability for battery must be brought within three years. *Ford v.

Douglas*, 799 A.2d 448, 451 (Md. Ct. Spec. App. 2002). Similarly, a claim based in negligence

or negligent supervision must be brought within three years Md. Code. Ann., Cts & Jud. Proc. §

5-101; *Hanscome v. Perry*, 542 A.2d 421, 425 (Md. Ct. Spec. App. 1988); *Doe v. Archdiocese of

Washington*, 689 A.2d 634, 637 (Md. Ct. Spec. App. 1997). A claim of civil conspiracy, which

the Court anticipates Green will, as authorized, add to an Amended Complaint, shares a statute of

limitations with the underlying tort. *Prince George's Cnty. v. Longtin*, 19 A.3d 859, 877 (Md.

2011) (citing *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009)) ("a civil

conspiracy claim incorporates not only every substantive element of the underlying tort, but also

its statute of limitations.").

"In Maryland, the general rule is that the running of limitations against a cause of action

begins upon the occurrence of the alleged wrong, unless there is a legislative or judicial

exception which applies." *Poole v. Coakley & Williams Const., Inc.*, 31 A.3d 212, 236 (Md.

2011).

One important judicial exception to the statute of limitations in Maryland is the

"discovery rule," which "tolls the accrual date of the action until such time as the potential

plaintiff either discovers his or her injury, or should have discovered it through the exercise of due diligence." *Poole*, 31 A.3d at 236. Under the discovery rule, limitations begin to run when a claimant gains knowledge sufficient to put him or her on inquiry. *Lumsden v. Design Tech Builders, Inc.*, 749 A.2d 796, 801 (Md. 2000). Being on inquiry notice "means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [cause of action]." *Anne Arundel Cnty. v. Halle Dev., Inc.*, 971 A.2d 214, 228 (Md. 2009) (citing *O'Hara*, 503 A.2d at 1324). A plaintiff's knowledge of the "nature" and "cause" of the injury triggers the running of the limitations period. *See, e.g.*, *Dashiell v. Meeks*, 913 A.2d 10, 21 (Md. 2006); *Frederick Road Ltd. P'ship*, 756 A.2d at 973.

Maryland also recognizes the fraudulent concealment doctrine which has the effect of tolling the statute of limitations. "If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." C.J. § 5-203. The "complaint relying on the fraudulent concealment doctrine must also contain specific allegations of how the fraud kept the plaintiff in ignorance of a cause of action, how the fraud was discovered, and why there was a delay in discovering the fraud, despite the plaintiff's diligence." *Dual Inc. v. Lockheed Martin Corp.*, 857 A.2d 1095, 1105-06 (Md. 2004) (citing *Doe v. Archdiocese of Washington*, 689 A.2d 634, 643 (Md. Ct. Spec. App. 1997)).

>    B.    Statute of limitations for claims relying on the bounty program

Without question, Green's injury occurred in 2004, and if no exceptions are applicable, the statute of limitations would bar Green's claims, all of which were first filed in the underlying state court action in 2013.

Pro Football and Royal argue that all facts necessary to the affirmative statute of limitations defense appear on the face of the Complaint, and that no exceptions apply. Defs.' Suppl. Mem. in Support at 9 (Paper No. 51). As Defendants see things, because Green says in his Complaint that he was immediately aware that Royal's hit injured him, and because he was suspicious that the hit was intentional, he must be deemed as a matter of law to have been aware of the "nature" and "cause" of his injury. He was therefore charged with investigating the remainder of his claims. Pro Football's Mem. in Supp. of Mot. to Dismiss at 5-6 (Paper No. 11-3). Green, in response, argues that both the discovery rule and the fraudulent concealment doctrine tolled the statute of limitations because his claims rest exclusively on the bounty program, which he, not to mention the public, was unaware of until 2012. Green's Mem. in Opp. at 13 (Paper No. 24-1).

The Court finds that on the face of the Complaint, Green has sufficiently pleaded applicability of the reasonable discovery and the fraudulent concealment doctrines, which, if proven, would toll limitations in the case. The exceptions potentially apply because the gravamen of the Complaint is Pro Football's alleged bounty program. Green specifically alleges that no one (presumably apart from Pro Football and Coach Williams or the Washington team's coaching staff) had knowledge of the bounty program until March 3, 2012, when the *Washington Post* article first suggested that the Washington team had a bounty program under former Assistant Coach Williams. Compl. ¶ 41. Green also alleges that Pro Football and Royal conspired to create the program, and that no one knew it existed until former players broke their silence over the existence of the program in the *Washington Post* article in 2012. *Id.* ¶¶ 35-41. Green points out that Royal told the press at the time that the hit was *not* intentional, a statement representing a flat-out denial and misrepresentation of what Green now says was the actual case.

*Id.* ¶ 39. These allegations suffice to suggest that Green might not reasonably have discovered the bounty program until it was revealed in 2012, and that Pro Football and Royal fraudulently concealed the cause of the action. This part of Green's Complaint, therefore, survives the Motions to Dismiss and/or for Summary Judgment. The ultimate trier of fact, i.e., the jury, will be able to weigh the facts and determine if Green's delayed discovery was reasonable and/or the fraudulent concealment doctrine applies. *See Bacon v. Arey*, 203 Md. App. 606, 653, *cert. denied*, 427 Md. 607, 50 A.3d 606 (Md. Ct. Spec. App. 2012) ("When there are questions of fact relating to when the statute of limitations began to run, those questions should be determined, in a jury trial, by the jury and not the trial judge.") (citations omitted).

Pro Football and Royal rely on *Doe v. Archdiocese of Washington* for the proposition that "[o]nce on notice of one cause of action, a potential plaintiff is charged with responsibility for investigating, within the limitations period, all potential claims and all potential defendants with regard to the injury." 689 A.2d 634, 644 (Md. Ct. Spec. App. 1997). They argue that in a battery case, "the invasion of the victim's dignitary interest is invariably concurrent with the actions that constitute the intentional tort itself." *Id.* at 643. Thus, "compensible [sic] harm occurs at the time of the battery, regardless of whether the victim is aware that the act is wrong or of the full extent of the harm." *Id.* These cases fail to persuade.

The battery in *Doe* is distinguishable from the battery that Green alleges. In *Doe*, plaintiff alleged that a priest had sexually abused him as a minor and the statute of limitations was tolled because he did not know the conduct was wrongful or actionable until years later when his marriage dissolved. The Court of Special Appeals rejected plaintiff's arguments about exceptions to the statute of limitations (both under a repression theory and a latent disease theory), noting that under such an argument, a plaintiff "would be in subjective control of the limitations period"

which "would defeat the twin goals of promoting diligent pursuit of viable claims, and allowing repose to defendants when claims have become stale." *Id.*

Unlike *Doe*, Green was not in subjective control of the limitations. The discovery that Royal's hit was conceivably legally actionable was first raised by outside events, i.e., by the news articles disclosing the alleged bounty program. In an injury case involving professional football players in the course of play, such as purportedly occurred here, given that strong, even violent physical impact is part and parcel of the game, it would not be immediately apparent that a player's "dignitary interest" had been invaded. A number of nonliability hypotheses could explain the hit, such as the reasonable belief that Royal was telling the truth following the game that his hit was unintentional, as well as Green's own Coach's reassurance that the hit was unintentional. *See, e.g.*, *Geisz v. Greater Baltimore Med. Ctr.*, 545 A.2d 658 (Md. 1988) (referring to fraud case where "a variety of nonliability hypotheses could have explained the facts known to the [ ] plaintiffs so that limitations was a fact question.") (citing *O'Hara v. Kovens*, 503 A.2d 1313, 1314 (Md. 1986)). Accordingly, the Court cannot determine, at this stage, whether Green's investigation of his claims was or was not reasonably diligent at the time of the hit, particularly in light of Pro Football's alleged concealment of the bounty program. This will be a determination to be made at a later date, as a fact question for the jury.[6]

---

[6] In Maryland, a claim for civil conspiracy requires proof of the following elements: 1) a confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) actual legal damage resulting to the plaintiff. *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007). Because this tort, which the Court has authorized Green to add in the Amended Complaint, essentially alleges an agreement or understanding between Pro Football and Royal to commit a battery on Green, the same rationale that vanquishes the Motions to Dismiss and/or for Summary Judgment on statute of limitations grounds as to the straight battery claim also apply to the civil conspiracy claim. It remains in the case.

C.      Statute of limitations for claims that do not rely on the bounty program

To the extent Green seeks to recover for his injuries independently of the bounty

program, it is clear his claims are barred by the statute of limitations. The Court raised this issue

at the hearing, and Green's counsel conceded the issue:

> [I]f the allegation was simply that Defendant Royal intentionally injured the
> plaintiff . . . it would be a different argument for purposes of the Statute of
> Limitations. And the reason why is this is a different complaint than a complaint
> that argued or alleged that Defendant Royal with malice of forethought attempted
> to injure the plaintiff during a football game December, 2004. If that were the
> allegation, if that were the cause of action, then I would agree that under the
> defendant's case law, the Statute of Limitations began in September, 2004. But
> this complaint is based upon the Bounty Program and the allegation that the
> Bounty Program did not come to light in any way, shape [until 2012]

Mot. Hr'g Tr. 59: 2-3, 8-18, Nov. 25, 2013.

The Court concludes, therefore, that Green cannot bring a pure negligence or battery

claim independent of the bounty program, because all of the elements of these torts would have

been immediately apparent as of 2004.

The Court therefore will dismiss with prejudice any and all claims based on negligence,

gross negligence (and malice), as well as battery not tied to the existence of the bounty program.

To the extent Green's claims rely on the bounty program, however, the Motion to

Dismiss and/or for Summary Judgment are not subject to resolution at this juncture and the

Motions will be denied.

**VIII.**

Preemption

Pro Football and Royal also argue that Green's claims are barred as a matter of law

because the CBA preempts the state law claims.

Section 301 of the LMRA provides that:

[s]uits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

Applying § 301, the Supreme Court has held that a state tort action is governed by federal law if it is "inextricably intertwined" with a collective bargaining agreement. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 220 (1985). To preserve uniformity in the federal law, the Supreme Court has further held that § 301 preempts state law claims that: (1) derive from a duty created by a collective bargaining agreement; or (2) turn on the meaning of a collective bargaining agreement. *Id.*; *see also United Steel Workers of Am. v. Rawson,* 495 U.S. 362, 369, (1990) (preempting plaintiffs' state law tort claims). However, not every "state tort suit brought by an employee covered by a CBA is preempted by the LMRA." *Brown v. National Football League*, 219 F. Supp. 2d 372, 378 (S.D.N.Y. 2002); *see also Allis-Chalmers Corp.*, 471 U.S. at 220. "[T]he bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994). State-law claims that have no relation to a CBA—other than the fact they are asserted by an employee covered by a CBA—are not preempted by § 301. *Smith v. Giant Food, LLC*, 931 F. Supp. 2d 717, 721 (D. Md. 2013) (citing *Caterpillar v. Williams*, 482 U.S. 386, 396 n. 10 (1987)). Section 301, for example, does not grant the parties to a collective bargaining agreement the ability to contract for what is illegal under state law. *Allis-Chalmers Corp.,* 471 U.S. at 212; *see also Lee v. Pfeifer*, 916 F. Supp. 501, 509 (D. Md. 1996) ("Because an assault is an illegal action, any provision of the contract which purported to give management the right to assault [plaintiff] would be illegal"); *Galvez v. Kuhn*, 933 F.2d 773, 777 (9th Cir.

1991) ("The prohibition against [battery and assault] exists independent of any contract, as does the state law standard defining their commission.")

All of Green's claims, to be sure, arise under state law. He alleges battery, negligence, negligent supervision, vicarious liability, and potentially civil conspiracy. The Court examines the elements of the remaining claims to determine whether it would need to interpret the CBA in resolving them. *See Jenkins v. PBG, Inc.*, 268 F. Supp. 2d 593, 596-97 (D. Md. 2003); *see also Foy v. Pratt & Whitney Grp.*, 127 F.3d 229, 233 (2d Cir. 1997) (citing *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 413, n. 12 (1988)).

### A.     Battery and Civil Conspiracy

The intentional torts alleged (or potentially alleged) are battery and civil conspiracy.

Under Maryland law, a battery occurs when one intends a harmful or offensive contact with another without that person's consent. *Nelson v. Carroll*, 735 A.2d 1096, 1099 (Md. 1999). While this claim arguably may involve some reference to the "Rules of Play" incorporated into the CBA, the battery alleged here – a block intentionally designed to cause physical injury pursuant to a bounty program – could not conceivably be authorized under the CBA, and therefore is not inextricably intertwined with it.[7] In short, the Court does not need to consult the NFL Rules of Play to determine whether a hit, intentionally designed to injure pursuant to a bounty program, if it occurred, was tortious conduct.

As for a claim for civil conspiracy (which Green may include in an amended Complaint, see *infra*), again that requires 1) a confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) actual legal damage

---

[7] At least one Court has suggested that the NFL Rules are *not* incorporated by reference into the CBA. *Brown v. Nat'l Football League*, 219 F. Supp. 2d 372, 387 (S.D.N.Y. 2002).

resulting to the plaintiff. *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007). As with the elements for battery, none of these elements is inextricably intertwined with the CBA.

Interpretation of the CBA "is not required to determine either whether a duty of care exists or to define the nature and scope of that duty" for these types of claims. *See Lee v. Pfeifer*, 916 F. Supp. 501, 509 (D. Md. 1996) (referring to action for assault under Maryland law). By extension, Green's allegations, if true, are based on a bounty program that paid players to deliberately injure opposing players. Again, the CBA has nothing that speaks to that scenario.

Other cases involving the NFL's CBA confirm this conclusion. *See, e.g.*, *Brown v. National Football League*, 219 F. Supp. 2d 372, 382 (S.D.N.Y. 2002) ("Courts of appeals have frequently held that claims of intentional torts like assault or battery brought by employees covered by CBAs against fellow-employees are not preempted by federal labor law.").

*Smith v. Houston Oilers, Inc.*, 87 F.3d 717 (5th Cir. 1996) bears extended comment. There the Fifth Circuit addressed intentional torts such as battery in the CBA context:

> Where the complained-of actions consist entirely of an employer's physical battery of an employee, there is no need for reference to a labor agreement; in such cases, it typically makes sense to say that, because the CBA at issue could not have condoned such conduct, resolution of the plaintiff's claim for battery does not depend on the meaning of the terms of the CBA. This comports with an underlying appreciation that the employer's physical attack on the employee is properly regarded as an issue of state law, not a matter of federal labor concern.

*Smith*, 87 F.3d at 720. To be sure, the court found preemption in that case because the underlying labor dispute over termination pay could not be divorced from the team's conduct in forcing players to choose between terms of termination and participating in an excessively demanding rehabilitation program. Resolution of the claims, it held, was too dependent on analysis of the CBA to escape preemption. By way of contrast, nothing in Green's Complaint amounts to a labor dispute. He is alleging an intentional physical injury by a player on an opposing team

pursuant to that team's program to deliberately cause (and rewarding players for causing) such injuries, as well as a conspiracy to cause these injuries.

Indeed, professional football players have successfully brought suits for intentional injuries in court systems in the past, unblocked (so to speak) by the existence of a CBA. In *Hackbart v. Cincinnatti Bengals, Inc.*, 435 F. Supp. 352 (D. Colo. 1977), Dale Hackbart, a player for the Denver Broncos team, brought suit against the Cincinnati Bengals team and Charles Clark, a player for the Bengals, when Clark allegedly struck a blow to the back of Hackbart's head during a game. Although not specifically addressing the issue of preemption, the district court acknowledged that within the CBA, there was "no provision for disputes between players of different teams." *Hackbart*, 435 F. Supp. at 354, *rev'd*, 601 F.2d 516 (10th Cir. 1979). While it is true that *Hackbart* dealt with an earlier version of the CBA, Pro Football and Royal have not specifically pointed to any provisions in the current CBA that have changed since *Hackbart*. The short of the matter is that Hackbart's tort claims, like Green's, did not arise from the CBA; they were also traditional state law claims. Any doubt in this regard was erased when the Tenth Circuit reversed the District of Colorado's finding that, because the injury had occurred during the course of a football game, it should not be subject to the restraints of the law. The Tenth Circuit distinctly found that "[t]he general customs of football do not approve the intentional punching or striking of others." *Hackbart v. Cincinnati Bengals, Inc.*, 601 F.2d 516, 521 (10th Cir. 1979). Accordingly, the appellate court held that the "trial court's ruling that this case had to be dismissed because the injury was inflicted during a professional football game was error." *Hackbart*, 601 F.2d at 524.

*Tomjanovich v. California Sports, Inc.*, No. H-78-243, 1979 WL 210977 (S.D. Tex. Oct. 10, 1979), involving an intentional injury to one professional basketball player by a member of

the opposing team, is also instructive. Rudy Tomjanovich, who played for the Houston Rockets team of the National Basketball Association, sued the Los Angeles Lakers team under a theory of respondeat superior after Lakers player Kermit Washington punched Tomjanovich in the face, shattering his face and jaw, during an on-court fight in 1977. *See Tomjanovich*, 1979 WL 210977; *see also* "Shattered and Shaken," Sports Illustrated, January 2, 1978.  The case was tried by a jury, which awarded Tomjanovich a $3.25 million verdict against the Lakers. Although there appears to have been no preemption analysis in the case, the fact that the case went to a jury in the normal court system suggests that the ordinary court system was seen as an appropriate venue for such a case, and that the theory of respondeat superior was an appropriate theory for vindicating intentional injuries in professional team sports contexts. *Tomjanovich*, 1979 WL 210977.

Again, insofar as the battery claim is tied to the existence of the bounty program, the claim, for now, survives the Motions to Dismiss or, in the Alternative, Motions for Summary Judgment.

B.     Grievance Procedures

Pro Football and Royal refer to a number of exclusive grievance procedures in the CBA they say Green failed to exhaust.

They argue that Article IX, Section 1 of the CBA provides a blanket prohibition on filing suits for non-injury grievances:

> Any dispute . . . involving the  interpretation of, application of, or compliance with, any provision of the [CBA], the NFL Player Contract,  or any applicable provision of the NFL Constitution and Bylaws pertaining to terms and conditions of employment of the NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article.

These procedures involve appointment of a mediator to resolve the grievance.

Pro Football and Royal also point to Article 8.3(C) of the NFL Constitution apply, which vests the Commission with

> full, complete, and final jurisdiction and authority to arbitrate . . . [a]ny dispute between or among players, coaches, and/or other employees of any member club or clubs of the League, other than disputes unrelated to and outside the course and scope of the employment of such disputants within the League.

Because the Court has already determined that none of Green's remaining claims arise from, or are inextricably intertwined with, the CBA, these grievance procedures quite simply do not apply to his state law claims.  Paying players to deliberately injure players on opposing teams cannot plausibly be said to be included in "terms and conditions of employment" or the "course and scope of employment." Such a contract is no more enforceable, even if lesser in degree, than a contract to kill, the universally illegal contract. *See, e.g.*, *Allis-Chalmers Corp.*, 471 U.S. at 212 (Parties cannot contract for what is illegal under state law).[8] Suggesting that the intended target of the mayhem could in any way be bound by a CBA to yield his right to seek legal redress in the face of such deliberate aggression is not only inadmissible; it is ludicrous.

## IX.

### Conclusion

Having concluded that the statute of limitations does not bar Green's battery and civil conspiracy claims (but that it clearly bars the claims related to negligence), and that the battery and civil conspiracy claims are not preempted by the LMRA or otherwise controlled by the CBA, Pro Football and Royal's Motions to Dismiss, or in the Alternative, for Summary Judgment (Paper Nos. 11 and 16) are **GRANTED-IN-PART** and **DENIED-IN-PART**. The

---

[8] Insofar as allowing this case to go forward will "open the floodgates" for any aggrieved player to sue for potential injuries in the inherently violent game of football, the Court does not believe that should be a concern. Green has pleaded with particularity that a deliberately injurious bounty program was established, as corroborated by quotes from players, and, moreover, that the specific assistant coach who has already been implicated in a bounty program at another team, was also involved in the bounty program that brought about Green's injury.

Motions are **GRANTED** insofar as any claims related to negligence, gross negligence or malice are dismissed with prejudice. The Motions are **DENIED** insofar as Green's claims related to battery, respondeat superior for the battery, and civil conspiracy survive. Green's request to amend the Complaint is **GRANTED**.

     A separate Order will **ISSUE.**


                                                                 _/s/_

                                           **PETER J. MESSITTE**

                             **UNITED STATES DISTRICT JUDGE**

**July 7, 2014**